1  ELISE STASSART, PRO SE
   21951 BEAR CREEK WAY
2  LOS GATOS, CA 95033

3

   IN THE UNITED STATES DISTRICT COURT
4
   FOR THE NORTHERN DISTRICT OF CA
5

6
   PHILIPPE & ELISE STASSART                 )Case No.: C08 01511 (JF)
7                                            )
                Plaintiffs,                  )
8                                            )
        vs.                                  )PLAINTIFF'S AMENDED COMPLAINT FOR
9                                            )
   LAKESIDE JOINT ELEMENTARY SCHOOL DISTRICT,)DIMUNITION OF REAL PROPERTY REQUESTING
10                                           )
                Defendant                    )DECLARATORY RELIEF AND DAMAGES
11                                           )

12

13  ——————————————————————————————

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                                     TABLE OF CONTENTS

3

4    INTRODUCTION....................................................................................3

5    JURISDICTION.....................................................................................4

6    VENUE............................................................................................4

7    PLAINTIFFS ......................................................................................4

8    DEFENDANTS......................................................................................4

9    STATEMENT OF FACTS.............................................................................5

10   ALLEGATIONS ....................................................................................6

11   GENERAL ALLEGATIONS............................................................................7

12   RIPENESS FACTOR........................................................................9

13   PARTIAL TAKING.................................................................................10

14   LACK OF DUE PROCESS............................................................................12

15   THE CHARACTER OF THE GOVERNMENT ACTION.........................................................12

16   SCHOOL FUNDING AND PROPERTY VALUES.............................................................12

17   SCHOOL PROXIMITY AND HOUSE VALUES..............................................................13

18   SCHOOL DISRUPTION AND HOUSE VALUES.............................................................14

19   SCHOOL QUALITY AND HOUSE VALUES................................................................14

20   SCHOOL CONSOLIDATION AND HOUSE VALUES..........................................................16

21   CONCLUSION.....................................................................................16

22   FIRST CLAIM FOR RELIEF -Declaratory Judgment...................................................22

23   SECOND CLAIM FOR RELIEF – Damages..............................................................22

24   PRAYER FOR JUDGMENT............................................................................22

25   TABLE OF AUTHORITIES...........................................................................23

26

27

28

**INTRODUCTION**

1. This action is commenced to ask the Court for a judicial declaration and provide compensatory damages against the Lakeside Joint Elementary School District for a partial regulatory taking of the plaintiff's real property without due process.

2. The Plaintiffs purchased their single family home in Los Gatos, California in 1989.  They spent more than a year searching for a property within a Los Gatos school district.  At the time of their purchase, their home was listed as being within the Lakeside Joint Elementary School District and the Los Gatos-Saratoga High School District.  While Lakeside Joint Elementary School District (LJESD) has a charter for K-8, at that time LJESD had a Memorandum of Understanding with the Los Gatos Union School District (LGUSD) to provide access to Fisher Middle School, grades 6-8, for all Lakeside students.

3. Plaintiffs had two sons at the time of their home purchase.  These sons attended Lakeside Elementary School, then Fisher Middle School, then Los Gatos High School.

4. At the time of their house hunting, Plaintiffs looked at houses in the Boulder Creek, Campbell, West San Jose, and South Los Gatos areas for comparative purposes.  These homes were located in the Union School District, the San Lorenzo Valley School District and the Campbell School District, respectively. At that time, Plaintiffs noted a price disparity of approximately $100,000 between homes located within Los Gatos school districts and the other school districts.

5. In 2005, Plaintiffs were awarded custody of Isaiah Winters, the child of a relative.  It was only when they enrolled him at Lakeside Elementary School they discovered that the MOU with Campbell Union School District was a

permanent contract.  They had thought that this was a temporary "stop-gap"

agreement until LJESD consolidated with LGUSD.  Both plaintiffs had discussions

with Martin St. John, the superintendent of LJESD, when their children were

enrolled within the Lakeside School District about future consolidation of

districts.  Mr. St. John had told them that in the event that LGUSD became a

Basic Aid District or the enrollment at Lakeside Elementary School fell below

fifty students, the districts would most likely consolidate.  Plaintiffs had

relied on that information.  Additionally, when their children were enrolled at

Fisher Middle School, Plaintiffs had engaged in discussion with the Fisher

school principal who advised them that he did not foresee a time when Lakeside

students would not be allowed to enroll in Fisher Middle School.

**JURISDICTION**

6.  This Court has jurisdiction under 42 USC § 1983 and the Fifth Amendment.

**VENUE**

7.  Venue is proper in this judicial district pursuant to 42 USC § 1983 as the

Plaintiffs reside within the Lakeside Joint Elementary School District and are

residents of Santa Cruz County, California.  A substantial part of the events

or omissions giving rise to this action arose in the County of Santa Clara,

which is located within this judicial district.

**PLAINTIFFS**

8.  Plaintiff Philippe (Ari) Stassart is a U.S. Citizen, owning real property

within the Lakeside Joint Elementary School District.  This property was

purchased with the understanding that residents would be allowed to enroll

their children at local Los Gatos schools.

9.  Plaintiff Elise Moss Stassart is a U.S. Citizen, owning real property within

the Lakeside Joint Elementary School District.  This property was purchased

with the understanding that residents would be allowed to enroll their children

at local Los Gatos schools.

**DEFENDANTS**

AMENDED COMPLAINT- 4

10. Defendant Lakeside Joint Elementary School District is a government agency responsible for providing school children full and equal access to the public education programs and activities it offers in compliance with the requirements of federal laws and regulations.  On information and belief, it is chartered and incorporated under California law.  Its responsibilities include making and implementing educational decisions for Lakeside Elementary School and supervising the Memorandum of Understanding between Lakeside District and the Campbell Union School District for the purposes of educating all middle school students.

### STATEMENT OF FACTS

11. In 2001, Los Gatos Union School District became a Basic Aid district.  This meant they would no longer receive money from the state for Lakeside students.

12. In 2003, LJESD entered into a Memorandum of Understanding (MOU) with the Campbell Union School District (CUSD), a non-adjacent school district, in order to avoid funding the education of their middle school students.

13. In 2003, the Plaintiffs had no children living in their home.  Both of their sons were adults at that time with their own residences.

14. Prior to entering into the MOU with CUSD, LJESD held two to three public hearings.  None of these hearings were noticed in the local newspaper of general circulation.  No notices were mailed to any property owners.  Only residents with children enrolled within the LJESD were noticed on the hearings.

15. Plaintiffs learned about the MOU with CUSD after it was a "done deal".  Plaintiffs were provided with no opportunity for due process.

16. There are approximately three thousand parcels located within the Lakeside Joint Elementary School District.  Of those parcels, less then one hundred families have children enrolled within the local school district.   Unless the property owners had children enrolled at Lakeside Elementary School between 2001 and 2003, they would not have been aware that LJESD had essentially devalued their properties by entering into an MOU with a distant district.

**ALLEGATIONS**

17. It is understood that most home buyers consider school district when purchasing a home.  School districts have several factors that affect the property values of homes within their districts:  Proximity, test scores, safety, school continuity, funding levels, and whether the district is Basic Aid (receiving most of the funding from property taxes) or Revenue Limited (receiving funding from the State).

18. Plaintiffs have suffered additional distress and damages because their child, Isaiah, did not receive an appropriate basic education in sixth grade and has no appropriate placement for the remainder of middle school.

19. Plaintiffs were burdened with the additional hardship of providing transportation for their child to a distant school at a considerable expense of time and money.

20. Plaintiffs have spent the past year fighting with their school district in order to assure their child a FAPE.  This would not be the case if the district had maintained the status quo.

**21.** Plaintiffs will be at a disadvantage when they attempt to sell their property because most home buyers do not want the education of their children disrupted by sending their students "out of district" fo**r three years.**

22. Plaintiffs' property value has been diminished because the designated middle school, Rolling Hills Middle School, is a farther commute, has lower test scores, has a higher drop-out rate, does not feed into Los Gatos High School, and is in an area with high gang activity.

23. Plaintiffs were denied due process because the Defendant District failed to notify property owners of the impending change. The Defendant District failed to provide any opportunity for property owners to submit comments in favor or against the MOU with the distant district.

1    **24.** The majority of parents with middle school students within the Lakeside

2         district currently home school, private school or move in order to avoid the

3         burden and disruption of sending their child to Rolling Hills Middle School.

4         All of these options require an investment of time and money on the part of the

5         parents.

6                              **GENERAL ALLEGATIONS**

7    If a government regulation deprives a landowner of "all economically beneficial us[e]"

8    of the property, there is a "total regulatory taking" for which the locality must pay

9    just compensation. If the regulation deprives the owner of less than all value, there

10   may be a compensable taking as well, since "[n]othing in the language of the Fifth

11   Amendment compels a court to find a taking only when the Government divests the total

12   ownership of the property; the Fifth Amendment prohibits the uncompensated taking of

13   private property without reference to the owner's remaining property interests."

14   *Noghrey v. Town of Brookhaven*, 2008 N.Y. App. Div. LEXIS 1329 (Feb. 13, 2008)

15

16   When making a diminution in value claim, the property owner claims a regulation has

17   caused property to lose value and seeks compensation. A loss of potential market

18   value, however, is not enough to trigger compensation. This principle recognizes that

19   other governmental regulations –like zoning limitations on neighboring land, parkland

20   set asides and infrastructure requirements–also increase the value of a specific

21   parcel. It would be unfair to the taxpayer (who is ultimately responsible for any

22   compensation) to allow a single landowner to claim a loss for one regulation when he

23   or she had benefitted from others. Instead, courts look to the degree to which the

24   regulation affects property value.

25

26   In this instance, Plaintiffs are alleging a partial taking.  With a partial taking,

27   courts look to these three main factors to make a decision on a case by case basis:

28   (1) the economic impact of the regulation; (2) the owners' reasonable investment

     backed expectations; and (3) the character of the government action. Admittedly, this

                              AMENDED COMPLAINT- 7

is not a very clear test. Of these three factors, the economic impact is the most

important. However, the impact must be significant.  Plaintiffs allege that the

actions of the Defendant District have devalued their property as much as thirty

percent.  In an area where homes routinely sell for more than a million dollars, that

is a significant amount of money.

    42 USC § 1983, upon which this action is premised, provides:

> "Every person who, under color of any statute, ordinance, regulation,
> custom or usage, of any State * * * subjects, or causes to be subjected,
> any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding
> for redress."

A municipality is a "person" subject to suit under 42 USC § 1983 (see Monell v New

York City Department of Social Servs. of City of New York, 436 US 658, 690). With

respect to land use, 42 USC § 1983 protects a landowner's rights to (1) equal

protection of the laws guaranteed by the Fourteenth Amendment, (2) just compensation

for the taking of property guaranteed by the Fifth Amendment, and (3) due process of

law guaranteed by both the Fifth and Fourteenth Amendments (see Town of Orangetown v

Magee, 88 NY2d 41, 49).


Since the plaintiffs are claiming deprivation of property, they must show the

existence of a protectable property interest (see Town of Orangetown v Magee, supra at

52). Protectable property interests arise when there is a legitimate claim of

entitlement pursuant to State or local law (see Town of Orangetown v Magee, supra at

52; Board of Regents of State Colleges v Roth, 408 US 564, 577; Crowley v Courville,

76 F3d 47; RRI Realty Corp. v Incorporated Vil. of Southampton, 870 F2d 911, 917-918,

cert denied 493 US 893; Yale Auto Parts v Johnson, 758 F2d 54, 58).  In this case,

Plaintiffs purchased their property with the reasonable expectation that their

children would be attending schools within their home high school district.  Further,

they sought assurances from local public officials both before and after they

purchased their property.

These assurances were provided by superintendants and other administrators with no hesitation.

In order for there to be liability under 42 USC § 1983, Plaintiffs must show that they was deprived of their property interest by conduct which is "arbitrary as a matter of federal constitutional law." Conduct which is "arbitrary or capricious and for that reason correctable in a state court lawsuit" pursuant to CPLR article 78 is not the same as conduct which is "arbitrary as a matter of federal constitutional law." *Harlen Assocs. v Village of Mineola, supra at 505.* To implicate Federal constitutional law, the conduct must be "so outrageously arbitrary as to constitute a gross abuse of governmental authority" *Harlen Assocs. v Village of Mineola, supra at 505; see Lisa's Party City v Town of Henrietta, supra, at 17; Natale v Town of Ridgefield, supra at 263.*

The lack of notification of all property owners of the impending change in educational services and the failure of Lakeside Joint Elementary School District to even consider the detrimental and disruptive effect their actions would have constitutes "a gross abuse of governmental authority."  Further, LJESD's rejection of any discussion on district consolidation, which would benefit the taxpayer, the property owners, and the students, indicates contempt for district property owners who are the primary financial support for the district.

**RIPENESS FACTOR**

The study by Thomas Kane, Douglas Staiger, and Stephanie Riegg, entitled "Do Good Schools or Good Neighbors Raise Property Values?" showed that there was a lag between changes in school assignments of about four years before housing prices react.  These economists found that total magnitude of price change was about six percent for each factor studied: school quality, proximity to school, peer disruption, and minority population.

1

2   Facial challenges to regulations are generally ripe under the finality prong, the

3 moment the challenged regulation or ordinance is adopted. *Cope v. Cannon Beach*, 317

4 Or 339, 342, 855 P.2d 1083 (1993); *Suitum v. Tahoe Reg'l Planning Agency*, 117 S. Ct.

5 1659 (1997); *Richardson v. City & County of Honolulu*, 124 F.3d 1150 (9th Cir. 1997);

6 *Sinclair Oil Corp., v. County of Santa Barbara*, 96 F.3d 401 (9th Cir. 1996); *Whitney*

7 *Ben., Inc. v. United States,* 18 Cl. Ct. 394, 407, *aff'd*, 926 F.2d 1169, 1171 (Fed.

8 Cir.), *cert. denied*, 502 U.S. 952 (1991) (a facial taking occurred upon enactment of

9 federal statute); *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680 (9th Cir. 1993),

10 *cert. denied*, 114 S. Ct. 924 (1994).  Nevertheless, where a <u>facial</u> claim is argued as

11 an unconstitutional conditions claim, ripeness rules may be applied by some courts.

12 *Nike v. City of Beaverton*, 35 Or. LUBA 57 (1998), *aff'd,* 157 Or. App. 397 (1998); *but*

13 *see Heal v. Hearings Bd.,* 96 Wn. App. 522 (1999).

14

15 **PARTIAL TAKING**

16

17 A categorical taking may be a total taking of a <u>smaller</u> interest that is less than the

18 whole.  While this may seem to conflict with *Concrete Pipe*, no one ever said the law

19 of unconstitutional takings was completely coherent.  Consider the following from

20 *Kaiser Aetna v. United States*, 444 U.S. 164 (1979):

21               "Moreover, an owner suffers a special kind of injury when a

22               stranger directly invades and occupies the owner's

23               property.  As [previous text in opinion] indicates,

24               property law has long protected an owner's expectation that

25               he will be relatively undisturbed at least in the

26               possession of his property.  To require, as well, that the

27               owner permit another to exercise complete dominion

28               literally adds insult to injury.  Furthermore, such an

occupation is qualifiedly more severe than a regulation of

the use of property, even a regulation that imposes

affirmative duties on the owner, since the owner may have

no control over the timing, extent or nature of the

invasion." (citations omitted)

In a case with enough lost value to warrant litigating the matter, *Palazzolo* makes clear that there is the potential for diminution of value cases that will warrant the payment of just compensation under the Takings Clause. *Palazzolo v. Rhode Island, (United States Supreme Court June 28, 2001*

*Steel v. Cape Corp.*, 677 A.2d 634 (1996), holds that denial of a proposal to rezone property on the basis that the new zoning district because the rezone would make school facilities inadequate was a regulatory taking citing *Dolan* and *Nollan*. This case does not categorize well under the traditional tests because it blends a variety of principles. The court determined:

"While the provision of public facilities is a legitimate concern of the County, the burden of providing adequate schools is disproportionately placed upon [the plaintiff] when residential use is denied them while being granted to its neighbors."

In this complaint, Plaintiffs' neighbors in adjacent Los Gatos School Districts, namely Los Gatos Union School District and Loma Prieta School District, have the privilege of sending their children to schools within the home high school district with no disruption to their children's peer relationships or education.

**LACK OF DUE PROCESS**

The gravamen of the cause of action pursuant to 42 USC § 1983 is deprivation of property without due process of law. The essential elements of the cause of action are conduct committed by a person acting under color of State law, which deprived the plaintiff of "rights, privileges, or immunities secured * * * by the Constitution or laws of the United States" P*arratt v Taylor, 451 US 527, 534, 535; see Town of Orangetown v Magee, supra at 52.*

In this instance, Plaintiffs were denied all due process of law.  The Defendant District failed to notify them of the impending change, failed to provide them the opportunity to influence the District's decision, and refused to provide any redress.

**THE CHARACTER OF THE GOVERNMENT ACTION**

Lakeside Joint Elementary School District entered into a Memorandum of Understanding with a distant school district for the sole purpose of avoiding funding the education of all middle school students.  This in itself displays a lack of integrity on the part of the District Trustees.  These Trustees expect local property owners to continue paying property taxes in full to a district that not only refuses to fund the education of their children, but has devalued their property as well.

Additionally, California taxpayers are funding the education of Lakeside students at Rolling Hills Middle School, reducing the funding that might be available to eligible students within the Campbell Union School District.

**SCHOOL FUNDING AND PROPERTY VALUES**

**According to** "*Public Schools and Private Real Estate Markets, 1940-2000",* there is a direct relationship between school funding and property values.  Plaintiffs reside in a Basic Aid district, but are required to enroll their child in a revenue-limited middle school.

In their "Using Market Valuation to Assess Public School Spending," Lisa Barrow and Cecilia Rouse found that for every dollar increase in per pupil state aid, aggregate per pupil housing values increase by twenty dollars. Fisher Middle School spends $9,566 per pupil. Rolling Hills Middle School spends $8,445 per pupil. Using the Barrow-Rouse formula, the difference in school expenditure is $1,111. This roughly equals $22,220 in housing value.

<h2 style="text-align:center">SCHOOL PROXIMITY AND HOUSE VALUES</h2>

The distance from the Plaintiffs' home to Rolling Hills Middle School is almost double the distance from their residence to Fisher Middle School. Interestingly enough, a study by Thomas Kane, Douglas Staiger, and Stephanie Riegg, entitled "Do Good Schools or Good Neighbors Raise Property Values?" discovered that the distance to the school was judged, not by how far the students had to travel, but how far the *parents* had to travel. Residences where parents had to travel farther to meet with teachers, participate in school events, and join the school community experienced a dramatic drop in value, following district reorganization.

According to Kwame Owusu-Edusei's study "Does Close Count? School Proximity, School Quality, and Residential Property Values", houses located more than 2.2 miles from a middle school were devalued by as much as 18%. Owusu-Edusei states, "The impact of school quality and proximity is not limited to families with school-aged children, but extends to residential property owners generally. As has been found in previous studies, school quality has a significant positive impact on residential property values. However, the impact of school proximity appears to be as significant in terms of property values, with close proximity generally making a positive contribution to property values while greater than average distance from schools correlates with significantly lower property values. Further, the impact of proximity was more consistent over time than school quality, perhaps because quality can vary within a school across teachers, grades, and over time. While this research cannot determine whether proximity matters because it means a reduced commute (for parents) or because

1  it means easy access to recreational facilities, the impact is consistently

2  significant for all school levels and over time."

3

4  In the case of the Plaintiffs, the difference in mileage between Fisher Middle School

5  and Rolling Hills Middle School is approximately five miles.  Using Owusu-Edusei's

6  formula, that is the equivalent to a property devaluation of 36%.

7

8                       **SCHOOL DISRUPTION AND HOUSE VALUES**

9  The study by Thomas Kane, Douglas Staiger, and Stephanie Riegg, entitled "Do Good

10 Schools or Good Neighbors Raise Property Values?" discovered that houses located in

11 areas where students' education was disrupted were the most severely impacted

12 downwards.  These were homes located in districts where students' peer relationships

13 were broken as the students were shifted from one school district to another between

14 elementary school and high school.  This is a similar situation to what Lakeside

15 District residents experience.  Most parents value continuity in education for their

16 children as they understand the value of cohorts in supporting their children and the

17 contribution stable peer relationships make towards academic and social success.

18

19 The Kane, Staiger, and Riegg study found that housing in school districts where

20 students' education was disrupted suffered a whopping thirty-two percent drop in

21 value.  Their study also noted that families who are willing to pay more to live in a

22 school district with higher test scores may also invest more in their homes.

23

24                       **SCHOOL QUALITY AND HOUSE VALUES**

25 "The quality of local public schools is widely believed to be a key determinant of

26 housing prices." *Money Magazine, "How Real Estate Builds Weath", June 2003.*

27

28 The California Department of Education recently released statistics on high school

29 drop-out rates.  Los Gatos High School has a graduation rate of 99%.  Campbell Union

High School, the high school Rolling Hills middle school students usually attend, has a graduation rate of 78%.  An article in the San Jose Mercury News, entitled "Middle School critical to students' success in high school" cited three new studies from the California Dropout Research Project which found that academic success in middle school is critical to graduating high school.  The test scores at Rolling Hills Middle School are substantially lower than the test scores at Fisher Middle School.

In "Public Schools and Economic Development: What the Research Shows", Economist Jonathan Weiss found that housing was substantially more expensive in areas where the schools were simply "perceived" as being better quality.  There can be no argument that the Town of Los Gatos has a perception of being a wealthier and more privileged area than the City of Campbell.

Weiss further notes that the quality of the school district is the number two reason most people purchase a home in a particular area, second only to the safety of the neighborhood, for why people choose to live in one residential area over another.

The Kane, Staiger, and Riegg study found that housing in school districts with higher test scores were roughly twelve percent higher than neighboring school district homes with lower test scores.  They found a one student-level standard deviation in a school's mean test score correlated with a ten percentage point difference in house value.

Rolling Hills Middle School reports an API Base Score of 843 compared to Fisher Middle School's API Base Score of 891.  This is a standard deviation of 24, roughly equal to a house value difference of $240,000.  Comparing real estate listings between the two school districts, this difference is supported by empirical data as well.

1

2                    **SCHOOL CONSOLIDATION AND HOUSE VALUES**

3  **When Los Gatos Union School District became a Basic Aid district in 2003, Plaintiffs**

4  **fully expected Lakeside School District to move towards consolidation with Los Gatos**

5  **Union School District.  According to a paper entitled "The Impact of School District**

6  **Consolidation on Housing Prices", July 23, 2007 published by the Wisconsin Center for**

7  **Education Research, rural school districts with a student body of less than 500**

8  **students had the most to gain from any consolidation with an adjacent school**

9  **district.  In cases where a rural school district had a student body of less than 200**

10 **students and consolidated with an adjacent school district, higher test scores, lower**

11 **costs per pupil and higher housing values resulted.  Consolidation can influence**

12 **property values through at least three different channels:  economy of scale (it**

13 **costs less to operate a larger school district), impact on state aid; and costs per**

14 **pupil.**

15                              **CONCLUSION**

16

17 With a partial taking, courts look to three main factors to make a decision on a case

18 by case basis: (1) the economic impact of the regulation; (2) the owners' reasonable

19 investment backed expectations; and (3) the character of the government action.

20 Admittedly, this is not a very clear test. Of these three factors, the economic

21 impact is the most important. However, the impact must be significant.

22

23 Plaintiffs argue that their property has suffered a diminution in value of at least

24 30%.  Comparing their property value to similar homes in the Loma Prieta School

25 District, an adjacent school district, Lakeside district homes have dropped in value

26 by 30 to 40% over the last four years while homes in the Loma Prieta School District

27 have maintained their value or appreciated by as much as 10%.  On the Plaintiff's

28 private road, a home sold in 2001 (before the 2003 MOU agreement went into effect)

was valued at 1.2 million dollars.  Last month, a different home on their road sold for $815,000.  That is a price difference of $385,000 or approximately 32%.

The Plaintiffs had a reasonable expectation that their children's education would be contained within the home high school district.  There was no possible way for them to foresee their local school district would enter into an agreement with a non-adjacent school district in order to avoid funding the education of their students.  Additionally, Plaintiffs, like most homebuyers, painstakingly selected their home with consideration of the school district in order to leverage the best home investment dollar.

The Fifth Amendment is not concerned with the propriety or virtue of the regulators' purpose in freezing the use of private property, or the exigency of the situation that gave rise to the perceived need for it.  For a proper exercise of the police or eminent domain power, the underpinning of such a beneficent purpose must exist; otherwise the action is *ultra vires* and void.  That much was plainly settled no later than 1922, when this Court examined a statute designed to stop land subsidence caused by underground coal mining and concluded that the prerequisites for exercise of both police power and eminent domain were present:

> "We assume, of course, that the statute was passed upon the
> conviction that an exigency existed that would warrant it,
> and we assume that an exigency exists that would warrant the
> exercise of the power of eminent domain.  But the question at
> bottom is upon whom the loss of the changes desired should
> fall."  (*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416
> [1922].)

*Pennsylvania Coal* was merely one in a long line of decisions in which this Court —

speaking from varied points on its ideological spectrum — patiently, and consistently,

explained to regulatory agencies that the general legal propriety of their actions and

the need to pay compensation under the Fifth Amendment present different questions,

and the need for the latter is not obviated by the virtue of the former. Emphasizing

the point, the dissenting opinion in *Pennsylvania Coal* had argued the absolute

position that a "restriction imposed to protect the public health, safety or morals

from dangers threatened is not a taking." (260 U.S. at 417.) Eight Justices rejected

that proposition. It is apparently necessary to say so yet again.


In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), New York's

highest court upheld a statute as a valid exercise of the police power, and therefore

dismissed an action seeking compensation for a taking. This Court (through Justice

Marshall) put it this way as it reversed:

> "The Court of Appeals determined that § 828 serves [a]
>
> legitimate public purpose . . . and thus is within the
>
> State's police power. We have no reason to question that
>
> determination. *It is a separate question, however, whether*
>
> *an otherwise valid regulation so frustrates property rights*
>
> *that compensation must be paid.*" (*Loretto*, 458 U.S. at 425;
>
> emphasis added.)

Similarly, in *Kaiser Aetna v. United States*, 444 U.S. 164 (1979), the Corps of

Engineers had decreed that a private marina be opened to public use without

compensation. This Court disagreed, and explained (through [then] Justice Rhenquist)

the relationship between justifiable regulatory actions and the just compensation

guarantee of the Fifth Amendment:

AMENDED COMPLAINT- 18

1    "In light of its expansive authority under the Commerce

2    Clause, there is *no question* but that Congress *could* assure

3    the public a free right of access to the Hawaii Kai Marina if

4    it so chose. *Whether a statute or regulation that went so*

5    *far amounted to a taking, however, is an entirely separate*

6    *question*." (*Kaiser*, 444 U.S. at 174; emphasis added;

7    citations omitted.)

8

9

10    In a similar vein are cases like *Preseault v. I.C.C.*, 494 U.S. 1 (1990) (Brennan, J.),

11    *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) (Blackmun, J.), *Dames & Moore v.*

12    *Regan*, 453 U.S. 654 (1981) (Rehnquist, J.), and the *Regional Rail Reorganization Act*

13    *Cases*, 419 U.S. 102 (1974) (Brennan, J.). In each of them, this Court was faced with

14    the claim that Congress, in pursuit of legitimate objectives, had taken private

15    property in violation of the Fifth Amendment. The governmental goal in each was

16    plainly legitimate (respectively, the creation of recreational trails, the licensing

17    of pesticides, dealing with the aftermath of the Iranian hostage crisis, and

18    widespread railroad bankruptcy). Nonetheless, the Court did not permit those proper

19    legislative goals to trump the constitutional need for compensation when private

20    property was taken in the process. In each, the Court directed the property owners to

21    the Court of Federal Claims to determine whether these exercises of legislative power,

22    *though substantively legitimate*, nonetheless required compensation to pass

23    constitutional muster. This bedrock principle of the law of constitutional remedies

24    goes back to the unanimous decision in *Hurley v. Kincaid*, 285 U.S. 95 (1932)

25    (Brandeis, J.), where the Court held that the remedy for a taking *resulting from valid*

26    *governmental action* is just compensation, not judicial second-guessing of governmental

27    policies and decisions through disruptive injunctions.

28

In *Nollan v. California Coastal Commn.*, 483 U.S. 825 (1987), the Court (through

Justice Scalia) examined California's plan to create an easement along the coast from

Mexico to Oregon, and concluded:

> "The Commission may well be right that it is a good idea, but
>
> that does not establish that the Nollans (and other coastal
>
> residents) alone can be compelled to contribute to its
>
> realization.  Rather, California is free to advance its
>
> 'comprehensive program,' it if wishes, by using its power of
>
> eminent domain for this 'public purpose,' see U.S. Const.,
>
> Amdt. 5; but if it wants an easement across the Nollans'
>
> property, it must pay for it."  (*Nollan*, 483 U.S. at 841-
>
> 842.)

And, of course, that concept is the underpinning for the Court's categorical rule that

if regulation denies all economically beneficial or productive use of private land, it

is a *per se* taking — no matter how beneficial it may be.  (*Lucas v. South Carolina

Coastal Council*, 505 U.S. 1003, 1015 [1992].)  That is why, under *Lucas*, a taking

*always* occurs when economically productive use is prevented, "*without* case-specific

inquiry into the public interest advanced in support of such a restraint."  (*Lucas*,

505 U.S. at 1015; emphasis added.)


Thus, for a taking to occur, it matters not whether the regulators acted in good or

bad faith, or for good or bad reasons.  What matters is the impact of their acts, not

the purity *vel non* of their motives.  Indeed, if their motives are benign, that only

fortifies the need for compensation by confirming that the taking is indeed for a

public use as required by the Just Compensation Clause of the Fifth Amendment.  Put

still another way, the exercise of the power to govern — whether by eminent domain or

by far-reaching regulations that *de facto* deprive the owners of their right to make

productive use of their land — is not a tort.  Nor is it *per se* wrongful — unless the

government refuses to pay the just compensation required by the Constitution.  That

TRPA may not *want* to pay for the impact of its regulations is irrelevant. That is, as

this Court put it when TRPA was here four years ago, "simply one of the risks of

regulatory pioneering, and the pioneer here is the agency, not [the landowner]."

(*Suitum*, 520 U.S. at 742 [Souter, J.].)


**FIRST CLAIM FOR RELIEF -Declaratory Judgment**

Plaintiffs ask for a judicial declaration that Memorandum of Understanding between

Lakeside Joint Elementary School District and Campbell Union School District

constitutes a partial regulatory taking, resulting in a diminution of value of all

real property within the Lakeside Joint Elementary School District.

**SECOND CLAIM FOR RELIEF – Damages**

Plaintiffs ask for reasonable compensation for the diminished value of their

residential property.

**PRAYER FOR JUDGMENT**

WHEREFORE, Plaintiffs pray judgment against the defendant as follows:


1.  Declare that Defendants' practices, actions, and omissions have violated the
     rights of Plaintiffs as protected under 42 USC § 1983 and the Fifth Amendment

2.  **Award Plaintiffs** reasonable compensation for the diminished value of their
     residential property.

1

2

3                                             Dated this August 25, 2008

4

5

6                                             Elise Stassart, Pro Se
                                              21951 Bear Creek Way
7                                             Los Gatos, CA 95033

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**TABLE OF AUTHORITIES**

3

*Cases:*                                                                                                              *Page*

4

*Noghrey v. Town of Brookhaven*, 2008 N.Y. App. Div.
LEXIS 1329 (Feb. 13, 2008)..............................................................7

5

Town of Orangetown v Magee, 88 NY2d 41, 49..............................................8

6

Monell v New York City Department of Social Servs.
of City of New York, 436 US 658, 690.......................................................8

7

8

Parratt v Taylor, 451 US 527, 534, 535 ..................................................12

9

Board of Regents of State Colleges v Roth, 408 US 564, 577................................8

10

11

Crowley v Courville, 76 F3d 47.............................................................8

12

RRI Realty Corp. v Incorporated Vil. of Southampton,
870 F2d 911, 917-918, cert denied 493 US 893................................................8

13

14

Yale Auto Parts v Johnson, 758 F2d 54, 58..................................................8

15

Harlen Assocs. v Village of Mineola, supra at 505..........................................9

16

Lisa's Party City v Town of Henrietta, supra at 17.........................................9

17

18

Natale v Town of Ridgefield, supra at 263..................................................9

19

*Steel v. Cape Corp.*, 677 A.2d 634 (1996) ...............................................11

20

*Palazzolo v. Rhode Island, United States Supreme Court June 28, 2001*.....................11

21

22

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) .....................................18

23

24

*Cope v. Cannon Beach*, 317 Or 339, 342, 855 P.2d 1083 (1993) .............................10

25

*Suitum v. Tahoe Reg'l Planning Agency*, 117 S. Ct. 1659 (1997)...........................10

26

*Richardson v. City & County of Honolulu*, 124 F.3d 1150 (9th Cir. 1997) ...........10

27

28

*Sinclair Oil Corp., v. County of Santa Barbara*, 96 F.3d 401
(9th Cir. 1996) .....................................................................10

1

*Cases:*                                                           *Page*

2

3   *Whitney Ben., Inc. v. United States,* 18 Cl. Ct. 394, 407,
    *aff'd*, 926 F.2d 1169, 1171 (Fed. Cir.), *cert. denied*,
4   502 U.S. 952 (1991) ............................................................................10

5   *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680 (9th Cir. 1993),
    *cert. denied*, 114 S. Ct. 924 (1994). ..................................................10
6

7   *Nike v. City of Beaverton*, 35 Or. LUBA 57 (1998), *aff'd*,
    157 Or. App. 397 (1998) ...................................................................10
8

9   *Heal v. Hearings Bd.,* 96 Wn. App. 522 (1999) ...............................10

10  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).....................18

11
    *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 [1992] .............20
12
    *Nollan v. California Coastal Commn.*, 483 U.S. 825 (1987) ................................20
13
    *Hurley v. Kincaid*, 285 U.S. 95 (1932) (Brandeis, J.) ....................................19
14
    *Preseault v. I.C.C.*, 494 U.S. 1 (1990) (Brennan, J.) ....................................19
15
16  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) (Blackmun, J.) ......................19

17  *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (Rehnquist, J.) ..........................19

18  *Regional Rail Reorganization Act Cases*, 419 U.S. 102 (1974)
    (Brennan, J.) ...................................................................................19
19

20  *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 [1922] ............................17

21

22

23

24

25

26

27

28

1

2  *Miscellaneous:*                                                                    *Page*

3  Yue Hu, John Yinger,
   The Impact of School District Consolidation on Housing Prices………………………..16

4

5  Russel W. Rumberger,
   Middle School critical to students' success in high school……………………………..15

6

7  Kelli Perkins, Jack Dougherty
   Public Schools and Private Real Estate Markets, 1940-2000

8

9  Jonathan Weiss,
   Public Schools and Economic Development:  What the Research Shows

10 W.T. Bogart, B.A. Cromwell
   How much is a Good School System Worth?

11

12 Lisa Barrow, Cecilia E. Rouse
   Using Market Valuation to Assess Public School Spending……………………………..13

13

14 *Walter Updegrave*
   *Money Magazine, "How Real Estate Builds Weath", June 2003*………………………15

15 Thomas Kane, Douglas Staiger, Stephanie Riegg,
   Do Good Schools or Good Neighbors Raise Property Values? …………………………..13

16

17 Kwame Owusu-Edusei
   Does Close Count?  School Proximity, School Quality,
   and Residential Property Values…………………………………………………...…….13

18

19

20

21

22

23

24

25

26

27

28

1  I am one of the plaintiffs in the above-entitled action.  I have read the foregoing

2  complaint and know the contents thereof.  The same is true of my own knowledge, except

3  as to those matters, which are therein alleged on information and belief, and as to

4  those matters, I believe it to be true.

5

6  I declare under penalty of perjury under the laws of the State of California that the

7  foregoing is true and correct.

8  _August 25, 2008_____

9  Date

10 _____

11 Signature

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28